## DECLARATION OF ROBERT A. HENSCHEL

I, Robert A. Henschel, Special Agent of the United States Drug Enforcement

Administration (DEA), do hereby declare:

### Introduction and Agent Background

1.      I have been a DEA Special Agent since October 2018. I am presently assigned to

the Washington Division Office (WDO), Tactical Diversion Squad (TDS), Group #13, since

October 2018. In connection with my official DEA duties, I investigate criminal violations of

federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841,

843, 846, and 848. I have received special training and participated in investigations concerning

controlled substances, as found in Title 21 of the United States Code, as well as the laundering

and concealing of proceeds from drug trafficking in violation of Title 18, United States Code,

Sections 1956 and 1957.

2.      I have previously been involved in the execution of numerous search and seizure

warrants involving money laundering and drug offenses, and other criminal activities, during

which evidence of criminal violations was seized, including monies or proceeds derived from the

sale of controlled substances, as well as records, ledgers and documents pertaining to the

purchase and sale of controlled substances.

### Purpose of this Declaration

3.      This declaration is submitted in support of a complaint for forfeiture *in rem* of

$278,951.72 in U.S. currency, seized from two accounts held at BB&T Bank in the name of

Personal Touch Medical Spa, LLP ("PTMS"): (1) BB&T Bank account #0005250339315

(PTMS Account 1) and (2) BB&T Bank account #0005250339323 (PTMS Account 2)

(collectively, the "PTMS Accounts"). The PTMS Accounts were opened at a BB&T Bank

branch in Forestville, Maryland.

4.      I submit that there are sufficient facts to support a reasonable belief that the

$278,951.72 in U.S. currency constitutes:  (1) money, negotiable instruments, securities and

other things of value furnished or intended to be furnished in exchange for a controlled substance

in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; and

(3) money, negotiable instruments, and securities used and intended to be used to facilitate a

violation of the Controlled Substances Act in violation of 21 U.S.C. § 841, and thus is subject to

forfeiture pursuant to 21 U.S.C. § 881(a)(6).

### Summary of the Investigation

5.      Since in or around November 2016, agents and investigators with the DEA have

been investigating unlawful prescribing by multiple Nurse Practitioners ("NPs") and Joyce

Edwards ("EDWARDS"), the owner of PTMS.  At times relevant to this investigation, PTMS,

formerly known as Holistic Health & Wellness Medical Spa, LLP ("HHWMS"), was located at

1450 Mercantile Lane, Suite 221, Largo, Maryland 20774.

6.      Based on a review of public healthcare and DEA databases, investigators

determined that EDWARDS is not, and has never been, a licensed medical professional and does

not have a DEA registration number.   A DEA registration number is an identifier assigned to a

licensed health care provider by the DEA to allow them to handle controlled substances in

accordance with the laws of the state in which they are legally authorized to practice.

7.      Controlled substance is defined in 21 U.S.C. § 802(6) as a "drug or other

substance . . . including Schedule I, II, III, IV or V of Part B of this subchapter . . . ."  Oxycodone

is listed as a Schedule II controlled substance by DEA.  Oxycodone is a semi-synthetic opioid

drug prescribed for pain.  As a Schedule II controlled substance, Oxycodone has a high potential

for abuse.

2

### A. *Reports from Pharmacists*

8.      In or around 2016, a DEA Diversion Investigator received an anonymous tip from a pharmacist in Baltimore, Maryland, expressing concern that an NP ("NP-1") was issuing prescriptions for controlled substances without a legitimate medical purpose and/or outside the normal scope of professional practice. NP-1 has a DEA Registration number and is registered at an address in Washington, D.C. The tip alleged that NP-1 was prescribing Oxycodone 30mg without a valid DEA registration in Maryland. The pharmacist reported that NP-1 was issuing prescriptions from PTMS (then operating as HHWMS) in Largo, Maryland.

9.      A subsequent investigation into the allegation revealed that NP-1 was practicing at PTMS and was issuing large quantities of Schedule II narcotic prescriptions without a DEA registration to practice in Maryland. Based on a review of data from the Maryland Prescription Drug Monitoring Program ("PDMP"), investigators determined that many of the individuals to whom NP-1 had issued prescriptions resided in the Eastern Shore, areas north of Baltimore, and Virginia, to include Norfolk, and therefore traveled significant distances from their residences to PTMS. Based on my training and experience, patients traveling significant distances – as well as patients traveling unusual routes, unusual high activity of patients at the practice, and use of cash to obtain prescriptions from a medical provider – are red flags which potentially indicate unlawful prescribing practices.

10.      On or about March 30, 2017, a Pharmacist in Charge ("PIC-1") at a large pharmacy contacted the DEA to report a suspicious prescription for 120 Oxycodone 30mg tablets written by another NP ("NP-2"), who was issuing prescriptions from PTMS (then operating as HHWMS). PIC-1 reported that the clinic name was "Holistic Health & Wellness Medical Spa," and PIC-1 thought a "holistic" health facility that issued prescriptions for controlled substances seemed suspicious. In addition, PIC-1 found it suspicious that a customer

3

with a Baltimore, Maryland address was attempting to fill the prescription in Columbia, Maryland.

11.     PIC-1 further reported that, a few days after she filled the prescription from NP-2, a female customer came to the pharmacy in Columbia, Maryland to fill a prescription for 120 Oxycodone 30mg tablets. PIC-1 noticed the prescription was from another NP at PTMS ("NP-3"). PIC-1 stated the second customer also had a Baltimore address, and PIC-1 decided not to fill the prescription due to her recent encounter with the prescription from NP-2.

12.     PIC-1 stated that she reviewed the Chesapeake Regional Information System for our Patients ("CRISP") database for both NP-2 and NP-3 and discovered that both NPs had a history of prescribing 120 Oxycodone 30mg tablets to their patients. CRISP is a regional health information exchange serving Maryland and the District of Columbia, which allows clinical information to move electronically among disparate health information systems.

### B. Undercover Operations

13.     During the course of this investigation law enforcement conducted numerous undercover ("UC") operations in which undercover agents visited PTMS on approximately thirty separate occasions and obtained approximately thirteen prescriptions for controlled substances without a legitimate medical purpose. In most instances, EDWARDS would provide undercover agents prescriptions for Oxycodone without the undercover agent encountering a lawful prescriber during that visit. For example:[1]

14.     On or about August 28, 2017, a DEA Task Force Officer ("UC-1") went to PTMS to obtain a prescription without a legitimate medical purpose. Members of the DEA Washington

---

[1] The examples contained herein describe some, but not all, of the UC operations conducted during the course of this investigation. This declaration does not, and is not intended to, include each and every fact and matter observed by me or known to the government. When I assert that a statement was made by an

4

Division Office Tactical Diversion Squad generated a fictitious report of a Magnetic Resonance Imaging ("MRI") scan for UC-1 to present during this visit. During the visit at PTMS, UC-1 met with NP-3. NP-3 told UC-1 that based on his MRI image, UC-1 did not need Oxycodone. Nevertheless, NP-3 wrote UC-1 a prescription for 60 Oxycodone 5mg tablets. NP-3 also wrote UC-1 a prescription for Narcan, the brand name for naloxone, a non-controlled opioid antagonist, primarily used for the emergency treatment of an opioid overdose. NP-3 also provided UC-1 with administration instructions for the Narcan in the event of an overdose. UC-1 paid EDWARDS $280 for the office visit.

15.     In September 2017, UC-1 advised EDWARDS that UC-1 could not fill his previous prescription of Oxycodone 5mg (obtained on or about August 28, 2017) because several pharmacies claimed that they did not have 5mg Oxycodone tablets in stock. EDWARDS advised she could change the dosage to 10mg tablets. On or about September 19, 2017, UC-1 returned to PTMS for the replacement prescription. EDWARDS told UC-1 that "the doctor" was not available, but EDWARDS had a prescription ready for UC-1. EDWARDS handed UC-1 a prescription for 60 Oxycodone 10mg tablets under NP-3's DEA registration number and bearing NP-3's signature. NP-3 was not present at the time.

16.     On or about December 11, 2017, UC-1 went to PTMS to obtain a prescription without a legitimate medical purpose. EDWARDS greeted UC-1 from behind the counter and escorted UC-1 to the back office. UC-1 observed EDWARDS writing out a prescription for UC-1. EDWARDS then handed UC-1 the prescription for 100 Oxycodone 30mg tablets. The prescription bore NP-3's DEA registration number and prescriber information. However, UC-1

individual, that statement is described in substance and in part, but my assertion is not intended to constitute a verbatim recitation of the entire statement.

did not observe NP-3 on site and did not see NP-3 at any time during the visit. UC-1 paid EDWARDS $250 for the office visit.

17.     On or about January 30, 2019, UC-1 went to PTMS to obtain a prescription without a legitimate medical purpose. UC-1 observed a new NP ("NP-4") working at PTMS. Although NP-4 was on site, NP-4 did not perform a medical examination on UC-1. EDWARDS wrote on a prescription that appeared to be pre-signed. EDWARDS then handed UC-1 a prescription for 120 Oxycodone 30mg tablets, bearing NP-4's DEA registration number, prescriber information, and what purported to be NP-4's signature. UC-1 paid EDWARDS $250 for the office visit.

18.     On or about December 12, 2017, a Charles County Sheriff's Office police officer, acting in an undercover capacity ("UC-2"), went to PTMS to obtain a prescription without a legitimate medical purpose. During the encounter, EDWARDS asked UC-2 if he preferred Oxycodone 30s (referring to 30mg tablets) or Oxycodone 15s (referring to 15mg tablets). UC-2 advised he wanted 30s. EDWARDS then escorted UC-2 and another patient to one of the exam rooms. EDWARDS entered the room holding a small square blue sheet of paper that appeared to be a prescription. UC-2 observed EDWARDS write a prescription for UC-2. EDWARDS then provided the prescription – for 165 Oxycodone 30 mg tablets – to UC-2. The prescription had been issued under NP-3's DEA registration number and purported to bear NP-3's signature, even though UC-2 had not seen NP-3 during this visit. UC-2 paid $250 for this visit.

### *C. Prescriptions Written While NP-3 Was Traveling Outside of the United States*

19.     On or about May 30, 2018, investigators reviewed a report of international travel conducted by NP-3 while NP-3 was the primary prescribing practitioner at PTMS. This report was generated by the Department of Homeland Security, Customs and Border Protection on or about May 8, 2018, and contained the dates and times when NP-3 departed and returned the

6

United States. According to this report, NP-3 departed from the United States on United Airlines (UA) Flight #934 (Newark to London) on April 10, 2018, and returned to the United States on UA Flight #961 (London to Newark) on April 27, 2018. Accordingly, the report indicated NP-3 was outside of the United States from April 10, 2018, through April 27, 2018.

20.     Investigators also reviewed the prescribing data reported to the Maryland PDMP covering the date range from April 11, 2018, through April 26, 2018 (*i.e.*, the dates that NP-3 was out of the country and unavailable to issue prescriptions). According to data obtained from the Maryland PDMP, Maryland pharmacies reported dispensing approximately 12,878 dosage units of various Schedule II controlled substances – specifically Oxycodone, methadone, morphine, and hydromorphone – pursuant to approximately 110 prescriptions purportedly issued by NP-3 while NP-3 was outside of the United States.

21.     Based on the information obtained through this investigation, investigators determined PTMS was operating as a "pill mill," and not providing legitimate medical services. Based upon my experience as a DEA special agent the following are examples indicative of pill-mill operations:  (a) a UC receiving pre-signed prescriptions for Schedule II medication with no medical practitioner in attendance; (b) a medical practitioner reviewing a fictitious MRI and telling the UC that according to the MRI the UC should not receive medication, yet the medical practitioner proceeds to write the UC a prescription for Oxycodone; (c) the medical practitioner provides no examination of the UC prior to the prescription being written; (d) not accepting insurance payments for services provided; (e) patients travelling in pairs or threesomes in the same vehicle to visit a pain clinic; (f) several family members receiving identical Oxycodone prescriptions; and (g) patients travelling long distances to obtain opioid prescriptions. All of the aforementioned have been observed at PTMS.

### D. The PTMS Accounts at BB&T Bank

22.     According to records obtained from BB&T, the PTMS Accounts were opened on or about July 7, 2017, by EDWARDS, in the name of PERSONAL TOUCH MEDICAL SPA LLP. Another PTMS employee, known as "H.P.," was added as a signatory on the PTMS Accounts on or about July 21, 2017. A third PTMS employee known as "C.M." was added as a signatory on the PTMS Accounts on or about December 19, 2017, at which time H.P. was removed.

23.     As of June 28, 2019, the balance in PTMS Account 1 was approximately $265,138.28. Between on or about July 7, 2017, and on or about June 28, 2019, approximately $760,468 was deposited to PTMS Account 1. Of that amount, approximately $684,612 were cash deposits and approximately $67,904 were deposits from credit card transactions.

24.     As of June 28, 2019, the balance in PTMS Account 2 was approximately $7,471.34. Between on or about July 7, 2017 and on or about June 28, 2019, approximately $77,988 was deposited to PTMS Account 2. Of this amount approximately $72,280 was cash deposits. There were no deposits from credit card transactions noted into this account. The remaining deposits consist of interest earned on deposits and minimal credit adjustments.

25.     Based on intelligence from the UC operations, an initial visit at PTMS typically costs $280 and subsequent visits typically cost $250. PTMS requested that patients pay in cash and the UCs paid for their visits in cash.

26.     In December 2017, PTMS began accepting credit card payments. Based on my training and experience, pill mills typically accept payments in cash, but it is not unusual for fees to be paid by credit card.

27.     During surveillance of PTMS, including surveillance at the close of several UC operations, law enforcement officers observed EDWARDS departing PTMS at the end of the day

8

and traveling to a BB&T Bank branch located in Upper Marlboro, MD 20774. Based on my training and experience, and knowledge of the investigation, I believe EDWARDS was visiting BB&T in order to deposit proceeds from PTMS into the PTMS Accounts.

28.   Bank records confirm that substantial cash deposits were made into the PTMS Accounts on or shortly after the dates of several UC operations in which a UC made a cash payment to PTMS. For example:

     a.   On or about August 28, 2017, UC-1 visited PTMS, received prescriptions for Oxycodone and Narcan, and paid $280 in cash to EDWARDS for the visit. According to bank records, on or about August 28, 2017, a $4,000 cash deposit was made into PTMS Account 1, and a $200 cash deposit was made into PTMS Account 2.

     b.   On or about December 11, 2017, UC-1 visited PTMS, received a prescription for Oxycodone, and paid $250 in cash for the visit. On or about December 12, 2017, UC-2 visited PTMS, received a prescription for Oxycodone, and paid $250 in cash for this visit. According to BB&T records, on or about December 12, 2017, a $3,000 cash deposit was made into PTMS Account 1.

     c.   On or about January 30, 2019, UC-1 visited PTMS, received a prescription for Oxycodone, and paid $250 for the visit. According to BB&T records, on or about January 30, 2019, a $3,200 cash deposit was made into PTMS Account 2.

29.   A review of BB&T bank records for the PTMS Accounts shows that cash deposits to the accounts occurred on a regular basis, sometimes on consecutive days, commensurate with the days the clinic was open for business. The cash deposits were frequently in round dollar amounts, increased substantially in 2017 and 2018, and were made to different accounts on the same date.

### E.   The PTMS Accounts at BB&T Bank

30.   On July 11, 2019, U.S. Magistrate Judge Charles B. Day issued a warrant to seize property subject to forfeiture for all monies in the PTMS Accounts. The DEA executed the warrants on July 12, 2019 and seized a total of $278,951.72 in United States currency:

9

$272,025.54 from PTMS Account 1 (Asset ID 19-DEA-655584) and $6,926.18 from PTMS Account 2 (Asset ID 19-DEA-655590).

31.     The seized U.S. currency is the defendant property in this civil forfeiture action and currently in the possession of the United States Marshals Service.

## Conclusion

32.     The evidence in this declaration provides probable cause to believe, and I do believe, that the $278,951.72 in U.S. currency recovered from the PTMS Accounts constitutes: (1) moneys furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; or (3) moneys used and intended to be used to facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. § 841, and is forfeitable to the United States under 21 U.S.C. § 881(a)(6).

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 21st day of February 2020.

Robert A. Henschel
Special Agent
Drug Enforcement Administration